UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                              Case No. 04-32139 - WRS
                                                   Chapter 7
THOMAS WOODS
LISA WOODS,

    Debtors.


ARLENE S. THROWER and
LARRY J. THROWER,

    Plaintiffs,                                Adv.Pro.No. 05-3018 - WRS

v.

THOMAS WOODS,

    Defendant.


## MEMORANDUM DECISION

This Adversary Proceeding came before the Court for trial on November 14-15, 2005. The Plaintiffs[1] were present in person and by counsel George H. Howard II. Defendant Thomas Woods ("Woods") was present in person and by counsel Von G. Memory. The parties have submitted post-trial briefs. (Docs. 38, 39). For the reasons set forth below, the Court finds that

---

[1] The named Plaintiffs in this Adversary Proceeding are Arlene S. Thrower, Larry J. Thrower, Angela G. Pittman, and Michael A. Pittman ("Plaintiffs"). Arlene S. Thrower is the mother of Angela Pittman and Larry Thrower is Angela Pittman's stepfather. The Throwers and the Pittmans respectively are husband and wife. Both couples reside on the same lot of property located in Jemison, Alabama.

the indebtedness[2] owed by Woods is not excepted from discharge, (i.e. the debt is discharged)[3]. The Court will enter its judgment by way of a separate document.

## I. FACTS

In June 2001, Plaintiffs Angela and Michael Pittman began to look for a manufactured home.[4] Because the Pittmans had a poor credit history, Angela's parents, Plaintiffs Arlene S. Thrower and Larry J. Thrower purchased a manufactured home for the Pittmans to reside in[5] from NU-2-U, Inc. ("Nu-2-U").[6] (Plaintiffs' Exhibit 151). Defendant Thomas Woods is the owner and manager of NU-2-U.

The form of the transaction is troubling in several respects. First, the contract indicates that the Throwers are the purchasers. In fact, the Pittmans were to be the true owners. Second,

---

[2] The Plaintiffs sued Woods for promissory fraud and other claims in the Circuit Court of Chilton County, Alabama, on October 4, 2002. Woods failed to respond to that suit and a default judgment was rendered against him in the amount of $250,000.00. (Doc. 35; Plaintiffs' Exhibits 200, 202).

[3] The Plaintiffs' complaint referenced counts pursuant to § 523(a)(2)(A), (a)(4), and (a)(6). Prior to trial the Plaintiffs abandoned their claim for "fraud or defalcation while acting in a fiduciary capacity," pursuant to § 523(a)(4). During trial, Woods moved for a directed verdict. The Court concurred with Woods that there was a complete failure of evidence as to the requirement of a "willful and malicious injury," pursuant to § 523(a)(6). The Court accordingly dismissed this count in the complaint pursuant to Federal Rule of Bankruptcy Procedure 7052(c). The only count remaining is the count brought pursuant § 523(a)(2)(A) alleging fraudulent concealment and promissory fraud.

[4] The court will use the term "manufactured home," however it should be noted that the parties used the terms "mobile home," "manufactured home," and "trailer" interchangeably.

[5] At trial Angela Pittman testified that her mother and stepfather were initially not going to be involved in the process of selecting a home. However, the Throwers became more involved as the home buying process developed and eventually they became the sole purchasers after it was discovered that the Pittman's could not purchase a home for over $40,000.00 as a result of credit problems.

[6] To date NU-2-U is no longer in the business of selling manufactured homes. Woods was at all relevant times the President of NU-2-U. Trip Woods, Woods' brother, installed homes sold by NU-2-U under Woods' license number. (Doc. 35).

the contract indicates that a down payment in the amount of $7,575.00 was made by the Throwers at the time the contract was executed. (Plaintiffs' Exhibit 151). The Throwers drew a check in the amount of $7,575.00, payable to NU-2-U. A copy of the check was provided to Conseco Finance to give them the false impression that $7,575.00, had actually been paid by the Throwers. In fact, the testimony at trial was unambiguous that the $7,575.00 check was not negotiated by NU-2-U. In fact, NU-2-U and the Throwers agreed that the check was not to be negotiated and the check was drawn for the sole purpose of causing Conseco to make a loan at a lower interest rate than they otherwise would have done had they known the true state of affairs.

In fact, a $1,500.00 down payment had actually been made by the Pittmans to NU-2-U. (Plaintiffs Exhibit 153). The check in question was made payable to cash. The Pittmans cashed the check and gave $1,500.00 in cash to Robert Beard, salesman for NU-2-U. The salesman gave the Pittmans a receipt for the $1,500.00 cash down payment. (Plaintiffs' Exhibit 152).

Third, the Plaintiffs falsified a written lease in furtherance of their scheme to mislead Conseco as to the true nature of the transaction. (Plaintiffs' Exhibit 166). It was intended by the Plaintiffs that the Pittmans would move into the new mobile home and that the Throwers would remain in their existing residence. However, for purposes of discussion with Conseco, the Throwers and the Woods executed a lease, showing that the Pittmans would lease the Thrower's residence, leaving the Thrower's free to move into the new mobile home. Apparently this was done to secure a more favorable interest rate. Had the purchasers not resided in the home, apparently Conseco would have insisted on a higher interest rate.

-3-

The delivery and setup of the mobile home was a comedy of errors. Angela Pittman testified that the wrong home was delivered to the Thrower's lot.[7] Shortly after the removal of this first home, at the request of the Plaintiffs, NU-2-U delivered a second home in two halves— the site was already prepared when the home was delivered. When the second home was delivered to the lot there was no plastic covering on the exposed interior of the residence. Double wide mobile homes are transported separately and assembled on site. While in transit, that is before the two halves are put together, the interior of the home was exposed to the elements. To protect the interior of the home, a plastic covering is typically placed over the exposed sides of the mobile home, until installation. Why that was not done here is not clear, however it is clear that the home was shipped to the site without plastic covering and that a covering was not placed on the exposed sides over night.

Plaintiff Michael Pittman testified that he questioned the individual who delivered the mobile home and was told that it would be alright. It wasn't. It rained that night and the interior of the home got wet. The inside of the home sustained wind and rain damage to the carpet and to the wallboards.

There is also a dispute between the Plaintiffs and Woods as to who actually financed the downpayment on the home and in what amount. Angela Pittman testified that she made a $1,500.00 cash down payment to NU-2-U salesman Robert Beard. (Plaintiffs' Exhibits 152, 153). Mrs. Thrower testified that Beard told her to write a check for $7,575.00 and that the check would not be cashed. (Plaintiffs' Exhibit 154). The $1,500.00 payment became an issue when Woods came to the Plaintiffs' home to monitor the setup and to request that a second set of papers be

---

[7] At trial it was discovered that Plaintiffs actually ended up with an "A model" home for the price of a lower grade "C model." Woods argues that the Plaintiffs skillfully manipulated the situation to receive a higher quality home, an "A model," as opposed to the home originally bargained for and purchased, which was a "C model" home. The Plaintiffs argue that Woods was aware that they had agreed on the purchase of an "A model" home.

-4-

signed with the corrected serial number. (Doc. 39). During this meeting at the home site the Plaintiffs demanded the $1,500.00 back because the paperwork did not reflect that a down payment in that amount had been made. Woods and Beard testified to the effect that the $1,500.00 was a deposit towards the $7,575.00, which the Plaintiffs agreed to pay in intervals. In other words, the arrangement was that Plaintiffs were supposed to make partial payments of $1,500.00 against the full down payment. After a heated exchange, Woods refunded the $1,500.00 to the Plaintiffs. Woods argues that when all the dust settled NU-2-U actually financed the down payment in the amount of $7,575.00 and took a loss on the $1,500.00 that was refunded to the Plaintiffs. While the parties dispute the issue of who actually financed the down payment, the Court understands this transaction to constitute nothing more than a scheme to defraud the finance company, Conseco, out of the $7,575.00 down payment that it required. This scheme is significant in that the Plaintiffs have not come to Court with clean hands.

Also of interest, the home was inspected on May 30, 2002, by Jerry O'Neil[8], on behalf of the Alabama Manufactured Housing Commission ("AMHC"), as a result of the Plaintiffs' consumer complaint. (Plaintiffs' Exhibits 191, 192, 193, 194, 195). O'Neil testified that several listed problems with the home constituted violations under the regulations enforced by AMHC. The home was also inspected by Aubrey Lloyd, a field inspector for AMHC. A copy of his inspection report is missing. The Court also notes that despite all of the problems with the home that Plaintiffs have complained of, the home bears an AMHC seal of approval indicating that it was set up and installed properly. (Plaintiffs' Exhibits 135, 136).

---

[8] In their case in chief Plaintiffs called Jerry O'Neil, part-time employee with AMHC, Jim Sloan, Administrator to AMHC, Thomas Woods, Angela Pittman, Michael Pittman, Larry Thrower, Arlene Thrower, and Randall Chesser, Plaintiffs' expert witness. In his case in chief Woods called Robert Beard, NU-2-U salesperson who sold the home and Thomas Woods.

As to the specific problems associated with the home, Mr. and Mrs. Pittman created a list and gave the list to Trip Woods[9] and the trim out crew on the Saturday of the week the home was purchased. The actual list that the Pittmans provided in this instance was not offered into evidence. Mrs. Pittman testified that the items on the list included: 1) cracked windows; 2) unacceptable trim out; 3) inoperable range hood; 4) cracked ceiling; 5) sagging floor; 6) inoperable stereo; 7) damaged wallboards; 8) inoperable toilet; and 9) an unbalanced stove. Woods arrived sometime that day either to have a new set of documents signed with the corrected serial number or to remind the Throwers to call Conseco so that the transaction could be funded.[10] Plaintiffs claim they gave the list of problems to Woods and that he made certain promises to them that he would do anything necessary to get these problems with the home corrected. Woods testified that he did not receive or see the list at that time. Woods acknowledged at trial that he did make promises to the Plaintiffs to fix problems that he directly caused and that he would make attempts to contact the manufacturer. In an attempt to demonstrate his sincerity in remedying the problems, Woods agreed to buy Plaintiffs a washer and dryer. Woods bought the washer and dryer. Woods denies that any problems with the home were discussed with him that day except the cracked wallboard. Plaintiffs testified that after that meeting at the home site, they had difficulty contacting Woods directly in regards to the repair of problems with the home.

It is undisputed that the manufacture, General Manufactured Housing, Inc. ("General"), came out twice to the Plaintiffs' home to correct problems attributed to it, including the range hood, the smoke detectors, the stereo, and the crack in the ceiling. It is also undisputed that the

---

[9] Woods apparently subcontracted the installation and set up work done on Plaintiffs' home to his brother Trip Woods. Woods testified that Trip Woods, Richard Mathews, James Johnson as well as a few other unnamed individuals actually performed the installation of the home.

[10] The transaction could not be funded until the Plaintiffs called Conseco indicating that installation had been completed.

Plaintiffs had some communication with Trip Woods, the Defendant's brother who actually did the mobile home installation, and that he attempted to fix the problems with the wallboards at the behest of Thomas Woods. The wallboards were repaired sometime in August, 2001, after much effort was expended finding the precise color match. Other problems such as the sagging floor, trim out on the ceiling, and the siding at the ends of the home, and the nail heads showing through the linoleum were never repaired.

The Court heard the testimony of witnesses and has considered thoroughly the evidence. While the Plaintiffs have proved a breach of contract, they have not proved a fraud. The representations made by Woods to the Plaintiffs at the time of closing were not statements of past or existing fact, but rather statements as to what he intended to do in the future. Therefore, to prevail, the Plaintiffs must prove a promissory fraud. In other words, the Plaintiffs must prove that Woods did not intend to make the repairs at the time he made the promise to the Plaintiffs. When considering a question of promissory fraud, one must take care so as not to make every breach of contract case a fraud, if the promisor does not make good on his promise. This is a difficult burden to meet, as it should be. Having considered the evidence, the Court finds that the Plaintiffs failed to prove that Woods did not intend to make the promised repairs at the time he made the promise.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## B. Standing

At trial Woods contended that the Pittmans lacked standing to bring the instant § 523(a)(2)(A) nondischargeability claim. The Court took this issue under advisement at trial. The manufactured home in question was purchased by the Throwers. Angela Pittman testified that initially the Throwers were not going to be involved in the purchase of the home, however, as the home buying process developed further, it became apparent that the Throwers were going to be the ones who signed the contract for purposes of getting the home financed. At no time did the Throwers ever intend to live in the home. The home was purchased for the benefit of the Pittmans and it was understood that they would make the payments to Conseco. Under Alabama law "'[i]t is not necessary to an action for misrepresentation that there be a contractual relationship between the representor and the person deceived.'" Kinney v. Williams, 886 So. 2d 753, 755 (Ala. 2003)(quoting Mid-State Homes, Inc. v. Startley, 366 So. 2d 734, 735-36 (Ala. Civ. App.1979); see also Potter v. First Real Estate Company, Inc., 844 So. 2d 540, 553 (Ala. 2002); Chandler v. Hunter, 340 So. 2d 818, 821-22 (Ala. 1976)(court allowed non-purchaser plaintiff to proceed on fraud claim because contract was made for her benefit). The Court concludes that the Pittmans have standing to bring this nondischargeability claim as they make

the monthly mortgage payments on the home, they reside in the home, and because the home was purchased on their behalf.

**C. Section 523(a)(2)(A)**

The Plaintiffs rely upon two theories of fraud which they claim render the debt owed by Woods nondischargeable; fraudulent concealment and promissory fraud. The Plaintiffs' fraudulent concealment claim rests on the theory that Woods closed the sale of the home knowing that certain problems existed in violation of the regulations enforced by AMHC. After hearing the testimony presented at trial, however, the Court finds it unnecessary to address this claim as there was no evidence produced demonstrating that Woods was aware of the specific regulations prohibiting the sale of the home. Also, the fact that the home bears an AMHC seal of approval indicating proper installation and set up undercuts this theory of fraud. For these reasons, the Court will address only the issue of promissory fraud.

Section 523(a)(2)(A), of Title 11 of the United States Code provides, in part, as follows:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt-
>
> (2) for money, property, services ... to the extent obtained, by -
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

To prevail on a fraud claim, the plaintiff must prove, with a preponderance of the evidence, the following elements:

(1) The debtor made a false representation of a past or current material fact;

-9-

(2) With the intent to deceive the creditor;

(3) The creditor justifiably relied upon the representation;

(4) The creditor sustained loss as a proximate result of the representation.

St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 676 (11th Cir. 1993); Capps v. Houston (In re Capps), 193 B.R. 955, 959 (Bankr. N.D. Ala. 1995); Checkcare Systems v. Alexander (In re Alexander), 212 B.R. 993, 996 (Bankr. M.D. Ala. 1997); Lycan v. Walters, 904 F.Supp. 884, 897 (S.D. Ind. 1995); McMullen v. Klaiman (In re Klaiman), 202 B.R. 813, 816 (Bankr. D. Conn. 1996); see also Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding that "justifiable reliance" was the appropriate standard rather than the more stringent "reasonable reliance" standard); Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(preponderance of the evidence is the proper standard for proceedings under § 523).

Exceptions to discharge are to be strictly construed in favor of the debtor. Meyer v. Riddon, 36 F.3d 1375, 1385 (7th Cir. 1994); National Union Fire Insurance Co. of Pittsburgh (In re Bonnanzio), 91 F.3d 296, 300 (2nd Cir. 1996); Chevy Chase Bank v. Briese (In re Briese), 196 B.R. 440, 445 (Bankr. W.D. Wis. 1996). Also, the burden of proving that the debt should be excepted from discharge is on the creditor. Fed. R. Bankr. P. 4005; see Check Control, Inc., v. Anderson (In re Anderson), 181 B.R. 943, 949 (Bankr. D. Minn. 1995). The standard contemplated by § 523 encompasses only conduct that is "truly blameworthy in an everyday sense, not just a legal or technical sense." In re Anderson, 181 B.R. 943, 948. Fraud implied in law, which may exist absent a finding of bad faith or intentional wrongdoing, is not sufficient to support a claim under § 523. In re Murphy, 190 B.R. 327, 332 (Bankr. N.D. Ill. 1995).

-10-

An actual, overt representation is the *sine qua non* of § 523(a)(2)(A). In re Capps, 193 B.R. 955, 959 (citing Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1578 (11th Cir. 1986)). This representation must relate to a past or existing material fact. Lycan v. Walters, 904 F.Supp. 884, 897; see also In re Immobilaire, 314 B.R. 139, 159 (Bankr. S.D. Ohio 2004).

Representations as to future intentions or promises to perform certain acts in the future generally do not give rise to actionable fraud, unless the defendant had no intent to fulfill the promise at the time of its making. See E &S Facilities v. Precision Inc., v. Precision Chipper Corp., 565 So.2d 54, 59 (Ala. 1990) (holding that "to establish fraud in a promise to perform in the future, it must be shown that the defendant, at the time of the promise, did not intend to do that act but intended to deceive."); Thomas v. Turner (In the Matter of Turner), 12 B.R. 497, 501 (Bankr. N.D. Ga. 1981) (generally a fraud action will not lie for misrepresentations as to future promises or facts, but an exception exists where, at the time the promise was made, the promisor had the intent not to perform the promised act); In re Norton, 248 B.R. 131, 133-34 (Bankr. W.D. Wis. 2000) (at common law, a promise of future performance or intention is actionable as fraud only if at the time the statement was made, the debtor never actually intended to honor the statement); In re McGinty, 276 B.R. 489, 495 (Bankr. N.D. Miss. 2000) (stating that representations that are promissory in nature do not constitute actionable fraud without proof of a present undisclosed intent not to perform when the representations were made); Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997) (holding that a debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions) (citations omitted); see also In re Tobin,

-11-

258 B.R. 199, 203 (9th Cir. BAP 2001) (noting that promissory fraud is a subspecies of fraud and deceit, with identical elements to common law fraud).

As this is a promissory fraud case, the Plaintiffs have a difficult burden to overcome. As to the first element, express representations have been demonstrated as Woods himself testified at trial that he made certain promises to Plaintiffs that he would do everything necessary to repair the problems with the home. There is also no doubt that Plaintiffs have sustained a loss.[11] However, as noted above, the Plaintiffs must prove that Woods had no intent to fulfill his promises to correct the defects and problems with the home at the time he made them.

The evidence reflects that Woods and his brother Trip engaged in efforts to repair at least some of the problems that were identified. Woods testified at trial that he contacted General regarding the electrical problems with the home and about the crack in the ceiling. This much is undisputed regarding repairs that were in fact made or attempted: 1) General came out to the home on at least two occasions to correct problems with the range hood, the smoke detectors, the stereo, and the crack in the ceiling; 2) the wallboards were repaired after the correct color match was obtained; 3) two different trim crews came out to the home to attempt to repair the trim; and 4) at least some discussion took place between Trip Woods and Thomas Woods regarding what problems needed to be fixed. Additionally, Mrs. Pittman's testimony taken as a whole reflects that she communicated with Trip Woods on several occasions during and after the home was installed. Mrs. Pittman testified that the crack in the ceiling was unacceptably repaired. However, the standard the Court must now apply is not one of complete satisfaction. See Jewell v. Seaboard Industrial, Inc., 667 So.2d 653, 660 (Ala. 1995)(mobile home purchaser presented no substantial evidence that mobile home manufacturer harbored an intent not to repair the mobile

---

[11] Plaintiffs' expert witness Randall Chesser testified that the actual damages to the manufactured home are $14,565.00.

-12-

Case 05-03018   Doc 42   Filed 05/19/06   Entered 05/19/06 16:09:01   Desc Main
Document     Page 12 of 16

home or otherwise injure or deceive the Plaintiff, despite not providing the "paradigm of good service"); see also Bryant v. Energy Homes, Inc., 682 So.2d 3, 6 (Ala. 1996)("[t]he mere fact that the promisor failed to perform the promised act is insufficient by itself to prove fraudulent intent for purposes of a promissory fraud claim). To be sure, Woods did not provide the very best service possible or even service rising to the satisfaction of the Plaintiffs, as clearly evidenced by the fact that certain problems remain unfixed including the sagging floor, the trim out on the ceiling, the siding at the ends of the home, and the nail heads showing through the linoleum. However, even taking into account the reality that all of the problems were not repaired, Woods or individuals working for him, did in fact make some effort to repair the problems on the list. This fact is directly inconsistent with the claim that he had no intent to fulfill his promises to correct the problems at the time they were made. These attempts were more than superficial as it appears that much effort was expended trying to appease the Plaintiffs, particularly with regard to the trim and the wallboards.

The Plaintiffs argue that Woods has contradicted himself at trial, in his deposition, and in responses to interrogatories. As direct evidence of Woods' intent not to fulfill his promises, the Plaintiffs point out that Woods admitted in his deposition that he had no intent to correct the floors, the walls, or the cracked windows. (Doc. 38). At trial Woods clarified this statement by testifying that he himself had no intention of engaging in the physical and manual labor involved in making the repairs but that his brother or other individuals working for him would perform this function. Plaintiffs also referenced the difficulties they had in contacting Mr. Woods directly. Again, the Court reiterates that Woods did not act as a "paradigm of good service" throughout this transaction, nor was his testimony particularly consistent on every point introduced at trial,

-13-

Case 05-03018    Doc 42    Filed 05/19/06    Entered 05/19/06 16:09:01    Desc Main
Document    Page 13 of 16

however, the fact remains that significant effort was made, by Woods and individuals working for him, to make repairs to the Plaintiffs' home. Therefore, the Court determines that Plaintiffs have not sustained their burden of proving that Woods, at the time he made the promises, never actually intended to honor them.

As a final point, Woods argues that Plaintiffs have failed to prove their burden with respect to the element of causation because all of the problems listed in Randall Chesser's expert report[12] could have occurred between the time the mobile home was installed and the date of his inspection, which occurred approximately fifteen (15) months after installation. At trial Woods suggested that various alterations performed by the Plaintiffs had actually caused all of the structural problems to the home. The factors mentioned included Plaintiffs' installation of a driveway, Plaintiffs' site preparation, and the presence or absence of a french drain. Woods also attempted to undercut the element of justifiable reliance by arguing that Plaintiffs were sophisticated individuals who skillfully obtained a home superior in quality; a washer and dryer; a $1,500.00 refund; and were relieved of making a downpayment. Essentially, Woods contends that Plaintiffs' good judgment was clouded by their desire to get a good deal on the home. Woods also pointed out that Plaintiffs did not apply for an extended warranty or read the manufacturer's manual. Plaintiffs adamantly contend on the other hand that the problems were incurred as a result of improper installation and that they in fact did rely upon Woods' promises. As it is determined that Plaintiffs have failed to sustain their burden on the element of intent to deceive, the Court finds it unnecessary to delve into any considerable analysis as to these other elements.

---

[12] Randall Chesser's report is dated September 10, 2002. Chesser inspected the Plaintiffs' home on September 5, 2002. (Plaintiffs' Exhibit 139).

## III. CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiffs have failed to prove an essential element of their § 523(a)(2)(A) claim— that Woods at the time of making promises to the Plaintiffs, did not intend to fulfill those promises but intended to deceive. See AT & T Universal Card Services Corp.v. Reynolds (In re: Dawson), 221 B.R. 828, 834 (Bankr. N.D. Ala. 1998)("[f]ailure to prove any one of the five elements is fatal to the creditor's nondischargeability case"). For this reason, the Court determines that the Plaintiffs have failed to sustain their burden of proving their nondischargeability claim and accordingly concludes that the debt owed to the Plaintiffs is not excepted from discharge pursuant to § 523(a)(2)(A). The Court will enter an Order that is consistent with this Memorandum Decision by way of a separate document.

Done this 19th day of May, 2006.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: George H. Howard II, Attorneys for Plaintiff
Von G. Memory,
William D. Azar, Attorneys for Defendant